We'll hear argument next in Case 13-553, the Alabama Department of Revenue v. CSX Transportation. General Brasher. Thank you, Mr. Chief Justice, and may it please the Court. The 4-R Act does not make railroads most favored taxpayers. It instead balances the needs of carriers, shippers, and the general public. Opposition in this case does balance those interests, and CSX's position does not. On the comparison class issue, we think the rule is this, and that's that courts should compare the taxation of railroads to the taxation of the mass of other businesses in the State, with a focus on whether a State is targeting or singling out railroads for a tax that the general mass of other businesses do not have to pay. Well, it said that in B-1, and it doesn't say that in B-4. Right, but I think the other tax that discriminates is also B-4. That's all it says, whereas, in 1, it said, as I value true marketer than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction is. It was so specific there, and in 4, they just say another tax that discriminates against a rail carrier. But I think the question is whether there's any reason to read B-4 to require a comparison class that is different than the one in B-1, B-2, and B-3. Yeah, there's a good reason, that they didn't spell out a specific comparison class. Well, I don't think that that is a sufficient reason, because I think that the comparison class that is spelled out in B-1, B-2, and B-3, if you apply it in B-4, it ensures that railroads are being treated fairly by tying them to a broad enough mass of politically influential taxpayers to keep their rates fair. And the competitor class here that CSX has proposed makes very little sense on the text of the statute. I mean, it also doesn't really make sense in light of what this Court said in CSX-1, where the Court said that at the very least we should be looking at similarly situated taxpayers. But, General, I think on this question, CSX-1, I think your reasoning flies straight into the face of it, because CSX-1 talks about the notion that 1 through 3 is very different from 4, and that you can't – this is just along the lines of what Justice Sotomayor said, that you can't draw anything about the meaning of 4 from 1 through 3, given that they're clearly – they use different language, they're directed towards different things. Well, I think the question here is whether you should be looking at general businesses or whether you should be looking at CSX's hand-picked class of competitors. And we've made the textual argument that that's the only thing that the text provides  of transporting goods, motor carriers are and railroads are. Well, because in this particular situation, CSX is comparing itself to motor carriers and water carriers, but it's not comparing itself to, for example, airlines or pipelines, which also compete with respect to CSX and transportation. But I think it – I think there's no reason to necessarily presume that competitors are similarly situated, especially for the purposes of State taxation. I mean, Amazon and Wal-Mart are competitors, but for State taxation they're not similarly situated. Well, if they're not similarly situated, then the railroad loses. That's right. And I think for the purposes of this text. That's a different question than saying what class they should be compared to. I don't think so, because I think the question is – is at the very least the question is what the comparison class should be, and I think that CSX tells us that at the very least they should be similarly situated to. But you see, when you say similarly situated, and I think that's right, but that seems to go to your second argument, which is, look, they're not similarly situated because there's another tax that falls upon motor carriers that doesn't fall upon railroads, and that seems to me completely fair, and – but – but not on the first question. Well, let me – let me explain briefly on how I think it does go to the first question, which is that we're talking about a sales and use tax, which is a tax on a transaction. It's a tax on a transaction on the purchase of tangible property. And so the comparison class here should at least include the many businesses that also pay that tax on the items that they buy for their business, and railroads are no more similarly situated to their competitors than they are to every other business in the State that is also paying the tax when it buys items that it needs for its business. Sotomayor, Generally, one thinks of sales and use taxes as flip sides of each other. But here, the basis of the comparison is not quite similar, because in one, it measures what you buy, whether you use the gas in-State or out-of-State, and the other measures only what you use in Alabama. So there's a dissimilarity in the comparison that's not the norm. Right. So – so if you put the comparison class issue aside and you look at the comparison of the tax that the railroads pay and the tax that the truckers pay, I think that they are comparable in the sense that those are the taxes that they pay on diesel fuel, and they're comparable really in two ways. As a practical matter, they're the taxes that both of these entities are paying on diesel. The circuit below said that was fortuitous and that at some point that could change. Well, I'm saying as a practical matter, they're the taxes that are paid by these two entities, and I'm saying as a practical matter, the exemption that Alabama is providing to the truckers is because they are paying the other tax on the same  Alitoso, on the comparator issue, suppose that railroads and trucks used exactly the same fuel all the time, no difference whatsoever, and suppose that Alabama taxed the fuel purchased by the railroads but not by the trucks. Would there be a violation then? Our position would be that, no, there would not be a violation on the comparison class issue as long as the general mass of businesses are still paying the same tax rate. And the reason I say that is because if you link the railroads' taxation to the general mass of other businesses in the State, then they're not paying an unfair tax rate. Do you think that result is consistent with the purpose of this statute? Yes. And the reason I say that is because the 4R Act was an omnibus bill. It did many things. It, for example, appropriated almost $2 billion for subsidies to the railroad industry. But with this particular provision, what Congress was getting at was it was trying to prevent States from singling out or targeting railroads for taxes, which, quite frankly, States have been doing for years. And so that was the harm that Congress was trying to prevent, and that is a harm that would be prevented if you used the general class of businesses. Roberts. They wanted to prop up, they wanted to support the rail industry in a number of ways, and it seems odd to say in a situation where they were giving them this much money, they still wanted to expose them to unfair competition by States that want to give other modes of transportation a tax benefit, but not to them. I mean, their economic viability depends upon how they're faring with respect to their competitors, not how they're, you know, faring with respect to, you know, an agricultural conglomerate in the State. Well, ultimately, railroads are competing against other railroads. But I think that they compete against trucks, too. Well, I think there's some – to a certain extent, they do compete, but to a certain extent, they're also complementary forms of transportation. If there were only trucks, they would be fine without railroads. You want us to write an opinion to say railroads generally do not compete with trucking companies. That's what you want to be the opening line of our opinion. No, no. I think the opening line of your opinion should be that courts should compare the taxation of railroads to the taxation of the general mass of other businesses with a focus on whether a State is singling out those businesses for a tax that railroads don't pay. Breyer, then fine, why don't you have a kerosene tax? Everybody pays 8 percent, except for railroads, they have to pay 20 percent. Okay? Now, it turns out that the only people who use kerosene besides railroads are ice cream wagons. Okay? Isn't the comparison – nobody else uses it. So wouldn't you in that situation compare the railroads to the ice cream wagons? That's not the general. That just happens that the State thought of a way of getting the railroads. So, well, I would say, I guess, that last thing is to think, we know you're clever State tax authorities and you'll figure out a million ways to do this. But if whatever way you figure out discriminates against the railroads, you lose. So why have a general class, a competitor class, or some other class? That, for, is a catch-all. Well, the why is because I think the goal should be here to create some kind of balance that actually gives enough ex ante guidance to the State. What about my case, then, when you say balance, et cetera, who wins? Well, I think ultimately the railroads would probably win that case. Because we look at all the tax, all the things, everybody pays 8 percent, that's what it says. Oh, no, I'm sorry. But if there was a special tax on kerosene and the only two entities that – I mean, that's, for example, there's a case. So now we're comparing the two entities that use kerosene. We're not ratio – what's an ice cream wagon, anyway? It's a wagon that uses kerosene to deliver ice cream. But I think the main point here is that there are lots of businesses in Alabama that are paying the sales tax on the items that they need for their business, and there are also lots of businesses that are paying the sales tax on the diesel fuel when they need diesel fuel for their businesses. So manufacturers, mining companies, construction companies, timber companies, those businesses are the kinds of businesses that the railroad should be compared to because that prevents them from being treated unfairly. Alito, on the question of diesel fuel, I got the impression – this is just an informational question – but I got the impression from the briefs that diesel fuel is diesel fuel except some of it is dyed. But is that true? Is it not the case that the dyed diesel fuel has a higher sulfur content than the clear diesel fuel and, therefore, costs less? It's my understanding that they are chemically the same, that the law is that the only difference between clear diesel fuel and dyed diesel fuel is that dyed diesel fuel is diesel fuel that has been indelibly dyed. So it's my understanding that they are chemically the same. It could be that the United States Government regulates those uses differently through some kind of environmental regulation, but I'm not aware of that. But I think – I think what the – setting the comparison class issue aside, what the district court did here is exactly what this Court told it to do when the Court remanded in CSX 1, and that's it looked at our justifications, it found that they had nothing to do with railroads, and it also found that the railroads weren't practically disadvantaged by the kind of treatment that they were getting, and they weren't practically disadvantaged with respect to truckers because the truckers are paying a higher tax on the years at issue here. And the railroads could pay that tax ultimately if they wanted to, but they don't want to because they realize that they're actually paying a lower tax rate on their diesel. Kagan. Kagan. General, one of the things that Mr. Phillips talks about is he – he makes the point that this is a very hard inquiry to carry out and that the experience of courts when they try to do this in commerce cases shows that. So what's your answer to that? Well, the inquiry that we're asking the Court to perform is not difficult at all, and the district court performed it in one paragraph of its decision, which is you simply compare the taxes that we are imposing on diesel fuel for the truckers versus the taxes that the railroads are paying on the same item. And this is inherent in CSX's complaint in this case, where CSX is asking the courts to compare its taxes that it is paying on diesel fuel to the taxes that its competitors are paying on diesel fuel. And so it's inconsistent for CSX to be arguing that that's the comparison and inquiry  And once again, as a purely legal matter, the tax exemption that we're talking about here is in the same part of the code that imposes the tax that the truckers have to pay. And the exemption reads, it says if you pay the tax on clear diesel, if you pay the fuels tax that Alabama imposes, then you don't pay any other tax imposed by State law. And so as a purely legal matter. Are you representing on behalf of the State that the railroads could pay the motor vehicle tax? Yes. If they chose. Yes. And that was our position in this Court in 2009. And it's a clear reading of Alabama law, because the reason the truckers are getting the exemption is because they're paying the same tax. They use the same type of diesel? The truckers use clear diesel, which is chemically identical to the dyed diesel that the railroads use. Can they use it? Oh, I'm sorry. According to the Federal law, can the railroads use? As far as I'm aware, there is no prohibition under Federal law. There is certainly no prohibition on State law with respect to the railroads using clear diesel. But the truckers can't use the dyed fuel. That's correct. Why is that? Well, it's because the tax on the clear diesel is higher than the tax on the dyed diesel. So that would be why they might not want to, but why? No, no. I think that's why States and the Federal government are telling them that they can't use the dyed diesel, because we want them to. It's not for environmental reasons? Are you sure about that? I don't think so. I mean, certainly the way this started is we started with a taxing scheme that required truckers to pay what at the time, at least, was much, much higher than railroads were paying. And so we wanted to prevent truckers from using the dyed diesel. The whole reason why we have clear diesel and dyed diesel to begin with is so that we could support this taxing scheme where we're imposing a per-gallon tax on the truckers. Now, talk about the water carriers. Right. Are you going to suggest that if they stop at a dock and eat a meal, they can't be charged a sales tax? Well, I think the district court said two things about water carriers, and either one makes sense, which is that the railroads didn't show any practical disadvantage with respect to water carriers, because the only evidence in the record with respect to water carriers is that they make up 1 percent of the market for shipping goods from one part of Alabama to another. And to go back to the complementary point that I was making earlier, the district court also quite rightly refused to simply assume that treating water carriers with this minor preference was going to harm railroads' bottom line. And this is why, is that, for all we know, a perfectly reasonable assumption would be if our tax treatment for water carriers actually increased the amount of water commerce coming into Alabama, that would also increase the amount of commerce that railroads are moving from docks to get to somewhere else in Alabama. So in light of the fact that there was essentially no evidence at all about water carriers to show that railroads actually suffered some practical disadvantage, I think the district court's reasoning of water carriers makes sense. Well, there isn't a practical disadvantage. They paid a tax that the water carriers haven't. And it makes the water carriers more competitive against them. Well, in my point, I think the district court was right to say, well, they're only 1 percent of the market for moving goods from one part of Alabama. Well, but under your argument, then you could give tax exemptions to many businesses and then those businesses would grow and give more goods to the railroads. So that's just simply that can't work. Well, I think my point being is that if the only evidence is what the railroads put into the record here, the district court doesn't have to assume that they're going to be practically disadvantaged. CSX's position in this case would mean that if the State offered a tax exemption or a tax incentive to a single competitor of a railroad, to a single company that just operates in a single city of the State, that CSX and every other railroad operating in the State would get exactly the same preference. And we could be offering that preference to a single company that costs the State $10,000. But to offer the same preference to the railroads would cost $40 million. Alitoson Why doesn't Alabama tax the fuel purchased by the water carriers? It's kind of curious. Is it just a remnant of an old understanding of the extent of the State's power? Yes. I think it's for historical reasons with respect to the taxation of interstate commerce by water. The provision at issue here actually taxes Alabama's own citizens when they're moving goods by water commerce from one part of the State to the other. So we're taxing that, those transportation. We're only not taxing it when someone moves goods from Alabama to some other State. And that's another reason why I think the water carriers are largely irrelevant, because the railroads here aren't even asking for the same tax treatment that we give to water carriers, in the sense that they don't want to pay taxes at all. They don't want some kind of different treatment based on whether they're moving goods from one part of the State to the other. Roberts, do you tax the water carriers when they move within Alabama? We tax intrastate shipments. So the exemption at issue here is only for the movement of goods in interstate commerce. How is that consistent with the statute admitting Alabama to the Union, which says the water the first time, the water will remain, forever remain public highways without any tax, duty, impost or toll? Well, fortunately, we haven't had that litigation. But I think to go to your point, Justice Alito, I mean, the historical treatment of water carriers is there's been historical preferences for water shipments by interstate commerce in this country ever since it was a country. And so that's the reason why we have this preference in our tax code. Do you think that when we send it back, if we did and you won, that suppose you win on the ground that there's no fixed group? It depends on the case who you compare them with. So here, compare them with the trucks. Now, you'll say, as you do say, that we have a very good reason for treating them differently. The trucks have to pay this extra tax for the fuel, and the railroads don't. My guess is, and this is what I want to know, that they'll come back and say, but the reason that they pay that extra tax is to support highways, and railroads don't use highways. And then you'll have to figure out whether that is discrimination or isn't discrimination, because, indeed, they do pay a higher tax. But it is to go to highways. And does that count or not? Now, my question, I don't think you can answer that, if you want to try. I'm really just interested, is that likely to be the shape of the argument or not? Well, I think the district court already addressed that. So you have a district court opinion in this case which found in our favor applying the competitive comparison class, and like I said, put the comparison class to one side, doing effectively what the court told it to do in CSX1. So the district court already addressed that and decided that when the State is using tax revenue for general public purposes, it really is irrelevant how the State is raising that revenue. We could have a yearly appropriation for highway maintenance, and it would be the same thing as having a dedicated source of funding for highway maintenance. And it's not as if the truckers are paying for all of Alabama's highway maintenance. We're also taxing other people in the State to add money to that to build highways. And so ultimately, I think the district court was right that that's just a red herring in large part of our favor. But the trucker tax is not directed to highways exclusively. It goes into general funds? No. The fuel tax that the truckers are paying is set aside for highway construction and highway maintenance. But my point is that it's not as if the truckers are the only ones paying for the highways to be built in Alabama. It's not as if the truckers are the only ones using the highways. We'd have to find some funds to build highways regardless of how we get them. And also, CSX's own expert, when testifying in this case, agreed that railroads also benefit from roads, railroads also benefit from schools. These are the kind of indirect benefits that the State has to provide as part of the general public purposes of the State. But I think the real problem with CSX's proposed rule in this case is that it provides zero ex-ante guidance to State policymakers about how to structure a tax system in a way that doesn't discriminate against railroads, but does actually require them to pay their fair share. And I think that's what the Court should focus on. In the Eleventh Circuit's opinion in this case, in footnote 5 of the opinion, the Eleventh Circuit recognized that even if we were requiring truckers to pay four times as much as we were requiring the railroads to pay, the Eleventh Circuit would still find that we are discriminating against railroads in that circumstance. I would like to reserve the remainder of my time for rebuttal. Roberts. Thank you, counsel. Ms. Goldenberg. Mr. Chief Justice, and may it please the Court. We disagree with Petitioners as to the comparison class issue and agree with Petitioners as to the issue of the alternative and comparable tax on the motor carriers. I'd like to start with the comparison class issue, if I could, although I'd like to devote time to both of those issues. With respect to the comparison class issue, I do think, as Justice Scalia's question indicated, that the omission of a specific comparison class in B-4 is extremely telling here when there is such a specific comparison class set forth in B-1 through 3. And I also think it's very important that I think there's a very good rational reason why Congress would have wanted to leave the comparison class issue open with respect to B-4 and not limit the comparison class in that arena to other commercial and industrial entities, and the reason is this. With respect to property taxes, I think Congress can rest assured that virtually all commercial and industrial entities are going to have real property, and that if you're grouping the railroads with those entities and you're doing something unduly burdensome, those entities are going to speak up, they're going to use their ability of the railroads to have that kind of comparison class. With respect to other kinds of taxation, nonproperty taxation, I don't think you can say that the same thing is true. And specifically with respect to diesel fuel, I think, and I'm just hypothesizing here, but it is very likely that there are many commercial and industrial taxpayers who either don't use diesel fuel at all or use very little diesel fuel in their businesses, such that a tax on diesel fuel that applies to them is a very small burden for them. And if you are going to count on the fact that they're going to speak up if there's a very burdensome diesel fuel tax that's laid on them and on railroads, I don't think that that holds true. And that's a situation in which if it's really railroads and their competitors who are using the diesel fuel, then the competitors are the comparison class that you ought to be looking to. I'm sorry. Sotomayor, could I ask, you know, in one set of cases, maybe a railroad is saying we're being singled out. In another set of cases, a railroad comes in and says, no, we're not being singled out, but our competitors are being treated better than we are. Are there any other kinds of cases out there, or is it mostly just, you know, as compared to the general taxpayer and as compared to competitors? Is there any other way to shape a complaint in this field? As far as I'm aware, there's not, and I'm not aware of cases that fall into any other category besides those. And I think the reason is that railroads don't make claims that people who aren't their competitors, a small group of people who aren't their competitors, are being treated differently than they are, because I think in situations like that, it's very easy for the State to come in and say, here's a reasonable distinction between those other people and you, the railroad. So, for instance, you had a church or a school that was being exempted from a tax that a railroad paid. It would be extremely easy for the State to say, well, churches and schools have socially beneficial or charitable purposes. They're not involved in business like railroads. Railroads don't compete with them. So it doesn't harm railroads' financial stability to have them exempted. So in some ways, the comparison class of competitors is sort of a proxy for the kinds of reasons that the State is going to be able to give in order to distinguish between the allegedly favored and less favored groups. I'd also like to point out that I think there are very serious problems with the singled out or targeted requirement that the State is espousing here, and that is that either, depending on how you apply it, it's going to be highly manipulable by the State or it's going to have major administrability problems, and let me explain why. If you have a true singled out requirement, so you find that railroads can't win a discrimination claim under B-4 unless they are the only ones who are subject to a tax, then I think it's extremely easy for the State to evade any B-4 liability whatsoever simply by grouping together with the railroad some other entity or set of entities on whom the tax burden doesn't fall very heavily or a set of entities that's not very politically powerful and won't speak up. And in virtually every case, the State would be able to escape from B-4 liability and sort of vitiate that provision. If you don't have a true singled out requirement, if you have a more kind of amorphous targeting requirement, then I think you have very problematic line drawing issues, because it's unclear whether if you've got five other entities grouped with the railroad or ten other entities or 20 other entities, whether that constitutes targeting and where you actually draw the line. And so I think that just applying the definition of discriminates that this Court laid out in its decision last time this case was here is actually much easier to apply and much easier to administer than any kind of targeted or singled out requirement. Alitoso, what is your response to CSX's argument that this is really a very, very difficult comparison to make? And so here, you have you have a formula that will be beneficial to one side or the other depending on the price of diesel fuel, if in fact diesel fuel is diesel fuel. But in one case, the tax is on the purchase of the fuel. In the other case, the tax is on the use of the fuel. They're used for different purposes. You know, it's easy for us to say, well, okay, go back and, you know, do it, district court or court of appeals. But how would you do – how would you resolve those issues? Why is it a manageable comparison to make? I think with respect to both of them, there are – I can explain why I think the taxes are comparable despite the arguments that have been raised. But I just want to back up and for a second make a larger point, which is I think what the lower court has done here and what courts of appeals have done generally is just sort of throw up their hands and say, under no possible circumstances could we ever compare taxes, could we ever look beyond the face of the challenge tax, and that can't possibly be correct. This Court in its Dormant Commerce Clause cases, in its cases about discrimination against the Federal Government and those with whom it deals, does just that, and there is no reason why the rule should be narrower here. Kagan. But I do think in one of Mr. Phillips's point is that maybe those cases don't fill one with confidence. Well, I think there is a long history, particularly in the Dormant Commerce Clause area, of the Court looking to alternative and comparable taxes. I think the Court has taken a very narrow view of what constitutes a substantially equivalent taxable item or event, for instance, and I don't disagree that that view could apply in this area. Well, you say it's doable, so could – can you address any of the points that I mentioned? Does it matter that one – that the revenue from one is dedicated to a single purpose rather than going into the – into the general pot? Does it matter that one is a tax on purchase and the other is a tax on use? I'm happy to talk about each of those. With respect to the first one, the purpose for which the tax revenue is being used, I don't think that that plays into the analysis under B-4 about whether there's a discrimination in imposing the tax. There may be, perhaps, in some dimension, discrimination in how the State uses its tax revenues, but that's not what the statute is about. The statute is about the tax burden that's imposed. Well, the obvious case, which is right here, is that the railroads say, you're taxing us at a higher rate. The State's response is, true, but we do it because the trucks pay even more for their diesel fuel. There's a higher tax. Their response is, but the reason that they do that is because they use highways. And we want to pay for those. Now, in terms of just pure logic, that is a point, isn't it? And so that's what I think is one example of what Justice Alito was driving at. And why do you not have to take that into account? And if you do, how? Well, I don't think you have to take it into account. What I'm suggesting is I don't think the analysis should go beyond the imposition of the tax and the tax burden because of the language of B-4 and also because otherwise you would end up in a very bizarre situation where you could have a unitary tax that fell on motor carriers and railroads equally. There's one tax provision that says motor carriers and railroads, you both pay X cents per gallon on your fuel, and a railroad could nevertheless come in and claim discrimination under B-4 if the State took that tax revenue and used it to build roads. That seems like an awfully strange result. It would also mean that you could have the same tax structure in different States that would be discriminatory in one State and not discriminatory in another, depending on how the State spent its revenues. I also agree with what my friend from Alabama said with respect to the evidence in the record here about how the motor carriers aren't being in some way kind of specially or uniquely benefited by the roads. Using money to build roads benefits the general public, and it also benefits railroads. Railroads use trucks to bring freight to and from their trains, and they're part of the system of the State where everybody needs these roads. And it may be that motor carriers benefit a little bit more than other people, but it is for the general welfare. That's what a tax is. Breyer, does it make a difference taxes on use as opposed to taxes on sales? I don't think it makes a difference that one is on use and one is on sale. For one thing, I do think that as a practical matter, those categories kind of blur together here. Motor carriers pay at the pump, which they experience as a tax on sales. Then later, under the International Fuel Tax Agreement, the State takes the money and kind of sends it around in this clearinghouse system to other States where the fuel may have been used. But it's not something that I think the motor carrier necessarily experiences as different than a sales tax. And on the other side of the equation, the railroads do pay their company, but sales and use taxes. My understanding is that railroads generally purchase their fuel, their diesel fuel wholesale. The definition of retail sale in the Alabama tax law says that when you buy wholesale, what counts as a retail sale is the withdrawal, use or consumption of the item. So I think the the ---- What about water carriers? Are you going to say anything about that? Certainly. In our view, the water carriers issue should be remanded to the court of appeals in the first instance because it hasn't addressed the district court's reasons why there is no discrimination. We are dubious that the district court's reasons are correct, but in any event, we'd urge the court not to simply decide the water carrier's issue without deciding the alternative incomparable tax issue, because in that case we think the State could just change the statute with respect to water carriers and all the motor carrier related issues would remain. Do you think that the ruling, the district court's ruling on the comparability of the taxes is also dubious?  No. We agree that the district court analyzed the comparability of the taxes correctly and did so with the agreement of the parties as to how they should be compared. Thank you, counsel. Mr. Phillips. Thank you, Mr. Chief Justice, and may it please the Court. Let me begin by debunking a statement that gets repeated often in this litigation, which is that somehow the railroads are here seeking a most favored nation opportunity. The truth is, in Alabama, we pay $10 million a year in sales taxes. We pay taxes every time we buy gasoline or fuel that we use on-road. We do that all the time. We have no quarrel with that. We don't have any objection to that. What we do at the State level is that we have no quarrel with that, we don't have any objection to that. Why don't you buy it in the adjoining State before you cross the Alabama lines? Well, I mean, there are ways of doing business, but we also are entitled to the protections under the 4R Act, which is designed, candidly, to ensure our financial stability, which means that we ought to always be in a position where we can approach all of our business decisions in the most efficient way and hopefully put ourselves in a position in order to compete against the motor carriers and the water carriers. And that's precisely what the comparison class takes you to, which is it's all well and good to say that, you know, the statute addresses targeting, and that's fine, and that's clearly right, because that's what Congress undeniably saw primarily in the kind of B-1 to B-3 range, and that's why it identified the specific class that it was worried about for targeting. But when it gets to the point of talking about every other form of discrimination and another tax that discriminates, in that context, it only makes sense to think about this in the context of your competitors, because Congress's other purpose in this was to ensure that there would be financial stability, that the railroads would once again be able to operate on their own. And obviously, to the extent that you authorize the States to choose for whatever reason to benefit motor and water carriers routinely to the detriment of the railroads, that completely undermines it. So it seems to me, and my colleague from the Solicitor General's office has done an excellent job of sort of going through the various points on the comparison class. I'm happy to answer any questions on that further, but I'm more inclined to deal with the justifications. On the justifications Roberts, just on the comparison class, can't you let the water carriers go? I mean, it's a very tiny percentage. It's an issue. It's governed by the admission to the union. They sometimes touch down in Alabama, they sometimes don't. And I don't want to have the case up here a third time. I won't take that last comment personally, Mr. Chief Justice. The, I mean, they have 1 percent of the market. We have 6 percent of the market. That's still an important competitor of ours. They stipulated, it's in their stipulation, these are a major competitor. We compete in a major way on the basis of the fuel that we use. We're talking about a statute at the time that was designed to ensure against the nonsurvival of the railroad industry. I think the idea, first of all, Congress knows how to incorporate a de minimis exception. It did it in the component dealing with B-1, B-3 as it gets applied. It didn't do it in B-4. And so, therefore, as much as I would prefer, and actually I can get you out of coming back here, because if you say that the water carriers are in fact within the class to be evaluated, there is no justification put forward. The Eleventh Circuit is 100 percent correct about that. So if there's one water carrier, you win, or if there's one odd method of transportation, you win. It sounds like most favored nation to me. No, but that's not the way the case comes here. The case comes here with a stipulation that water carriers are a major competitor of ours. It's not that there's only one of them. It's that there is a significant amount of traffic that flows. We have 6 percent, they have 1 percent. Sotomayor, the district court appeared in its opinion, and I may be wrong, to say that you, in fact, had not proven that they were really competitors. It seemed to say you had not shown the competitive impact. Right. And that's what I took it to be saying, that you hadn't shown that they really do take resources away from you. Well, first of all, that's inconsistent with the stipulation. But, two, the district court got it 100 percent wrong, even as Judge Cox in his dissenting opinion said in the Eleventh Circuit, which is that we satisfy our obligation to demonstrate the prima facie case by showing that the water carriers are flatly exempt on the face of the statute. That's facial discrimination. It becomes the State's burden at that point to justify it. And if the State had wanted to come in and say, oh, sure, we can justify it because they're not really competitors in some sense, that would be fine. But that's not their stipulation. Their stipulation is that this is a major competitor of ours on a subject matter, fuel, that is a major portion of the way in which we compete against each other. So I think, Your Honor, the easiest way not to have to see me again, at least representing CSX in this context, is to say water carriers count. It's their stipulation. We shouldn't have to get to this issue in any event, because I don't think it was in the cert petition, and there's really no reason to go ahead and try to sort out the thorny issues that Justice Alito was talking about as to how you're going to try from here on to apply the comparability standard in this particular case. Alabama wants to do it in a very simple-minded way. How much are you paying today and how much are they paying today? And if it's close enough, that's good enough for government work. The problem with that is, is that all of the case law that deals with comparability and this Court's decisions have run about as far away from notions of comparability as you can, since it first adopted the rule to deal with the straight, strict sales tax and use tax, which really are the mirror image of each other. Ever since then, every other tax has been analyzed under those standards. The Court has said, no, no, that's not the way we're going to do – we're not going to get into that comparability analysis. And I would most – most particularly point you in the direction of Professor Hellerstein – Hellerstein's brief, where he describes, he says, look, if it's true comparability, that's one thing. But we're talking here about taxes that are – the taxes that are not mutually exclusive proxies for each other. They are imposed on different activities, at different rates, and for different purposes. And how we're going to ask a district court to say these are sufficiently similar. Sotomayor I'm just not moved by the purpose part for the following reason. I think your brother was absolutely correct that how the State uses its tax revenues is a personal decision by it. It could have put all the money into the Treasury and said, well, we're going to calculate what we spend on highways according to this formula, because we want to do it. That's exactly what they've done here. They could say, we're going to beautify the route for railroads, and we're going to give them X amount of money to do that from our State treasury, and we're calculating it a little bit from the fuel they bought. Justice Sotomayor, I think it's a more – it should be a more nuanced analysis than that. And I disagree with my friend from the Solicitor General's office on this particular point, because when you're talking about the use that's put to it, there's no question that we couldn't bring a claim that says we're taxed exactly the same in all ways. You know, it's two sales taxes. One's called a sales tax against railroads, and the other's called a sales tax against motor carriers, and come back in and say, but you're going to use that money for their benefit and not for our benefit. That – we couldn't make that claim. That – no doubt about that, and we've never made a claim like that. But it is – the situation is reversed. They have created an exemption for motor carriers. It is now their burden to justify, in all respects, consistent with the overall purposes of the statute, that exemption. And there, it seems to me, it is fair game for us to say, wait a second, what are you going to use that money for? You're using that money to benefit the – the motor carriers. Now, we pay money to that, and we – we benefit that – we benefit from that, too, when we actually use the highways. But what this money is designed for, and what the motor carriers want, is more taxes like that, because that way they improve the quality of the roads and helps them to be a better competitor against us. It seems to me, in a situation where you're trying to justify discrimination against us designed to eliminate the possibility of undermining our ability to compete, whether or not that the State uses that money for to undermine our ability to compete should still be fair game under B-4. And that's why I would urge the Court to read Professor Hellerstein's brief and analyze the complexities that are embedded in the regime the State asks you to go to. If you don't want to go that far, then I'd ask you to simply say the water carriers is enough on a basis to say this is unconstitutional and affirmative. Roberts. Just to get back to them, it's 1 percent and 6 percent of what? Of the interstate business. Interstate business. Did the Court of Appeals deal with your point you just made about the special purpose of the extra tax that the truckers pay? Not in precisely those terms. What I'm trying to figure out is how are they supposed to conduct this comparison analysis? What they did is they didn't do it. No, no, but that's exactly what the Eleventh Circuit said, is once you open that case and Professor Hellerstein tells you you have to look at, the inquiry becomes limitless. Breyer. Suppose the reason that the truckers have to pay this extra tax is not to go into a fund that benefits them. Suppose, indeed, it's to go into a fund that benefits railroads. I mean, so doesn't you have to say whether or not you wouldn't say that no matter what the purpose of this extra tax is, don't consider it, would you? Well, what I would say is when you know that the taxes are not mutually exclusive proxies. I mean, the question is, I don't think this Court is going to have any ability to sort of sit down here and try to come up with a set of standards of comparability. What I would ask the Court to look at is in this case, what do we know? That these are taxed on – these are imposed on different activities, the privilege of using the roads as opposed to a sales tax, at different rates, 15 cents versus 4 percent, which in the last four years, we know, have been to the disadvantage of the railroads, and in this case, for different purposes. The fact that there may be another case in which they decide to make them for the same purpose, that would still not modify the core of what the comparability analysis requires, which remains enormously complicated and not – and to my mind, at least, not worth the candle. Of course it isn't, you want. And the – and what's worrying me is the state taxes are so complex, and that they didn't even have a – they didn't really have a chance, they could have, but they didn't, go into the what is this extra tax the truckers pay, is it comparable and that's a good reason for having them pay less sales tax, or does it really have nothing to do with the price of anything, and therefore, it's a bad reason and therefore, you win. They didn't consider that. That's what's worrying me, and if I send it back, if I – if we do that, not only do we have to do it, they have to go through all this again. We're going to have to tell them just what to do, which that sounds worse to me, and moreover, it may come back here again. We can – we can just – I understand all that, but it seems to me, Justice Breyer, everything you just said there should lead to the conclusion that the right answer here is to affirm, and to do so because they had the opportunity to put in evidence, they followed a simple-minded approach, as of day one, there's – this is the amount of money that's being paid, that's close enough for me, we're done, as opposed to the true comparability analysis that would be required. Sotomayor How do we do that – how do we do that with the water carriers? I do see your point with respect to the motor vehicle drivers, because there the entire argument was around comparability, and was it comparable. And the Court said – but it basically said, we're not going to get into it. If they call it something else, we won't do it. Right. It didn't quite say what you said. No, but I think, one, the Court can certainly recognize that what I said is precisely part of the problem that comes out of the comparability analysis. Once you get into evaluating different purposes – Now you want a really broad rule that says, you've got to use the same label on every tax state. You've got to treat competitors with the same label all of the time. Or the same tax. I mean, I don't – at the end of the day, that is the rule I'm hoping for. If they had done a mirror excise tax, you would have been happy. Yes. I would not have a complaint on that score. On the other – but just to be clear, Justice Sotomayor – That's still a comparability issue. Right. It's a single comparability issue. The problem here is, if you go down the road of sufficient justification, it is an extraordinarily complicated comparability issue. And I would hope the Court wouldn't want to go down that road, more than because I won this case. But more fundamentally, the Court doesn't have to go down that road, because there is a major competitor and there was never a justification given for that. Sotomayor, on the water carriers, it never addressed the – the court below never addressed the Eleventh Circuit, never addressed the reasons that were given. Well, that's because the reasons that were given were completely – well, the concurring – the concurring Judge Cox did. He said those reasons don't justify it, because all he said was you – and if you look at the district court's rationale, it won't get you home, either. Because, again, first it said it's our burden to demonstrate that there's – that there's been an injury. That's not our burden. We satisfied our burden. And the Eleventh Circuit said that when we – when we came forward. Then – so it was their – their – with an exemption. Their burden to show why, the only thing they came up with was – or the only thing the district court bought was, well, we hadn't proved, once again putting a burden on us, that this would be constitutional in all circumstances. That's not enough to justify allowing an exemption like that to remain in place. And the – and essentially the court of appeals basically said there is no rational justification for it. There's not been one put forward. It's a relic of 50 years ago. And that's not a sufficient – I would hope that's not a sufficient justification than the meaning of the court's prior opinion. If there are no further questions, I'll let you proceed. Ginsburg. He asked, well, what do you do if the district judge didn't make the comparison between the motor carrier tax, and you say that that comparison was inadequate because? Because it didn't – it didn't take into account the rest of the analysis. It didn't deal with the purpose. It didn't deal with the nature of the tax. All it said was that at a particular arbitrary point in time, the amounts weren't all that different. But it also said that if you don't engage in that kind of comparison, then you're going to end up with the railroad becoming the most favored taxpayer. But that's just a conclusion. It's not – it's not true, because it is always available to the State to put our competitors in the same position we are in. And if for some reason that's not possible, then that might well be a sufficient justification for some differential tax. But it is all – in this context, it is clearly possible. There's no problem, you know, removing the exemption for the – for the sales tax that the water carriers pay. There is no problem imposing a 4 percent sales tax on the clear fuel that the motor carriers pay. If they do that, we're done. Is that what it – I might have missed it. But why isn't it a sufficient justification for different treatment of the water carriers that the statute admitting Alabama to the Union said they couldn't tax traffic on the river? Well, I think because the Constitution has changed. First of all, I don't know what the Constitution might have changed. But I don't know that that's a tax on the river, because that could just be the tax that's designed to deal with like a toll road. So I don't know what that language actually refers to. This is just a tax on gasoline that's being used to allow you to get on the river. So I don't – I don't – I mean, given that this wasn't subject of any scrutiny by anyone nor put forward in any serious way, I don't – I mean, I don't think it's a legitimate justification. But in any event, it's still available to Alabama. Well, I suppose you could say Alabama would take the risk if it removes the exemption that somebody would bring suit against them. But I don't think that's a very serious challenge. Suppose the State taxed railroads at 4 percent, but then gave them a credit against what they paid on the highway tax. Would you be back in the same position you are now? They gave an exemption to the – I'm sorry. They gave a deduction for the sales tax against what they've paid in highway taxes. So you're talking about the railroads and what we pay in highway? No, the State. I just want to make sure I understand. I missed it. They taxed the truckers the same as they taxed you, 4 percent. Right. But then they give the truckers a deduction for whatever they paid in the highway tax. Well, no, then I think we'd be right back to the same – same vote. As I understand the court of appeals' judgment as to the truckers, the court of appeals just said it's too complicated, forget it, we're not even going to look at Alabama's argument. Now, you're here and you're saying, well, Alabama's argument is too simple. There's a whole raft of other things to – to include in the analysis of whether that tax on the truckers is, in fact, comparable. But the decision that we have before us just threw its hands and refused to look at the whole alternative tax issue, that seems to me a problem for you, isn't it? Well, in the first place, it's not a problem for me if you decide on the water carriers. But even on – on its own terms, it seems to me this Court has previously recognized and sneed in a similar anti-discrimination provision that it is simply not appropriate to do the kind of simple analysis Alabama proposes here and just say, at the end of the day, electricity is going to be better off in State than out of State or out of State than in State, so don't worry about it, we're good. But doesn't it have to be appropriate as going in that Alabama can say, here's the tax that we impose on truckers, they're really being treated in the exact same way, just under two different provisions of the tax code, and then it's up to you to say why that's wrong. Right. But – and we did say why that's wrong. But that's not what the court of appeals said. The court of appeals did not say, oh, you know, CSX has convinced us that these are not comparable taxes. Instead, what the court of appeals said is we're not even going to look at whether they are comparable taxes. Right. And I realize, I recognize a bit of a disconnect there. But the reason why they said they weren't going to engage in that inquiry is because the very items I've identified, the nature of the tax, the purpose of the tax, the incidence of the tax, are very – are all complicated issues, and you can go through the rest of the Hellerstein criteria, very complicated issues, and if the State's only going to come in here and try to defend itself on the basis that at one point in time the money is pretty close, that's not going to get it done. And so then the question is, and this is where I think the Eleventh Circuit said, look, this is clearly not enough, we're not going to go down this path. And so that's the ruling. Now, if the court wants to quarrel with that at some point, I don't think this is the right case in which to do that. First of all, this issue wasn't presented in the cert petition. And second of all, it's completely unnecessary to resolve this particular case properly. You can affirm on at least two alternative reasons without having to go down the path of figuring out exactly whether comparability is worth the candle. If there are no further questions, now I'll let you get your lunch. Thank you, Counsel. General Brasher, you have five minutes. Thank you, Mr. Chief Justice. Let me just make a few quick points. One is that if you adopt the position that the State's justifications matter, it's no more difficult to analyze a justification that has to do with another tax than any other justification. As a matter of fact, it's a lot easier because you can just use math as opposed to evaluating some of the justification. And the justification with respect to the truckers is that we are obligated under a series of interstate agreements and international agreements and Federal law to impose a per-gallon tax on the truckers. And then once you impose that tax on the truckers, the question arises, should you also impose an additional sales tax on the same transaction, the purchase of diesel fuel? And it makes perfect sense for the State to say as a policy matter that we're not going to double tax the same transaction. It was surprising to hear my friend talk about how he would be fine if the State tried to treat railroads in a way that was the same as truckers, because that's exactly what the State of Tennessee did. And it found itself in a real quandary that this Court needs to prevent, which is the railroads were arguing that Tennessee was discriminating against them because the railroads weren't treated like truckers. They won that litigation, and so Tennessee turned around and tried to craft a statute that treated railroads exactly the same way as truckers, and in the railroad suit, again, saying that they were being targeted or singled out for a tax that no one else had to pay. And I think that is a necessary implication of the rule that my friend on the other side is adopting, which is that it is discrimination to treat railroads unlike any one that they particularly say that they compete with, and it's also discrimination to try to avoid that discrimination. And the other point I would make is that we're not talking in this case about a tax on diesel fuel. We're talking about a sales tax. When CSX sends us a check for their taxes, there's one line and it says sales tax. This is how much we pay to the State based on sales tax. And everybody else, all the other businesses in the State that have to pay the sales tax on the items that they need for their businesses are sending us the same check that says this is what we have to pay on sales tax. And with respect to diesel specifically, manufacturing companies, timber companies, construction companies, when they send us a check, they say sales tax, and that includes everything else that they have to pay on the sales tax and the diesel fuel. And that money that we're using, that we're collecting by the sales tax, goes primarily for education, which is something that the railroads benefit from, just like everyone else in the State. But ultimately, what we're asking the Court to do is adopt a rule that if we are using the handpicked class of competitors, that courts actually have to weigh the State's reasons for the exemptions in its tax code, and with a focus on whether the railroads are suffering any practical disadvantage. And that's what the Eleventh Circuit refused to do. That's ultimately what the district court did do. And I think I disagree with my friend on the other side about the burden of proof in this case. It's always going to be the railroad's burden of proof to show discrimination. And I think the district court applied exactly the right formula for determining that, which is — which if you're in the zone where you're using the railroad's competitors as a comparison class, then you're in that area because you're worried about whether they're suffering some practical disadvantage vis-a-vis their competitors. And so it makes sense only to strike down a tax if they actually are suffering some real-world practical disadvantage, and that's something that they never showed in this case. Ultimately, what the Court should do is it should put itself in the position of a State and local policymaker who is trying to impose a fair and nondiscriminatory tax scheme that does not discriminate against railroads, but does actually require them to pay their fair share of taxes. I think we proposed two rules in this case that would allow that State policymaker, when he or she is being lobbied by all sorts of other industry groups to get tax exemptions, to figure out whether they can give those tax exemptions without also eliminating the taxes that a completely separate industry group would ultimately pay. And that is that you can use a comparison class of general other businesses with a focus on whether railroads are being singled out, or you can say that courts must actually weigh a State's reasons for the exemptions in its tax code with a focus on whether railroads are being practically disadvantaged, unless the Court has any further questions. Anything you can give us on barges? Well, I would make one point about that, in that the only thing in the record is not only that they're 1 percent of the market, but that specific stipulation that we entered into is about the intrastate market, 1 percent of the intrastate market. And that's actually where they're taxed. So the only thing in the record about barges, it doesn't even go to my friend's arguments. And once again, they're not asking for the same tax treatment as the interstate water carriers. If they were, then there would be a lot more litigation on that point, because those water carriers have an exemption that, like I said, taxes when they're moving goods from one place to an Alabama to another, but doesn't tax them when they're moving those goods from Alabama to another State. So that's the same ship going from one place in Alabama to another place, paying taxes on its diesel fuel, when the same ship goes from Alabama to somewhere else, it's not. That's not what the railroad's ever asked for, which is the reason why that issue has not really been litigated in the case. Thank you. Thank you, counsel. The case is submitted.